# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| **ARCHDIOCESE OF ST. LOUIS and CATHOLIC CHARITIES OF ST. LOUIS,** | ) <br> ) <br> ) <br> ) |
| *Plaintiffs*, <br><br> **v.** | ) <br> ) <br> ) |
| **KATHLEEN SEBELIUS, in her official capacity as Secretary of the U.S. Department of Health and Human Services; HILDA SOLIS, in her official capacity as Secretary of the U.S. Department of Labor; TIMOTHY GEITHNER, in his official capacity as Secretary of the U.S. Department of Treasury; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; U.S. DEPARTMENT OF LABOR; and U.S. DEPARTMENT OF TREASURY,** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

CASE NUMBER: _____

JUDGE: _____

DATE STAMP: _____

**JURY TRIAL DEMANDED**

## COMPLAINT AND JURY DEMAND

1.    This lawsuit is about one of America's most cherished freedoms: the freedom to
practice one's religion without government interference.  It is not about whether people have a
right to abortion-inducing drugs, sterilization, and contraception.  Those services are freely
available in the United States, and nothing prevents the Government itself from making them
more widely available.  Here, however, the Government seeks to require Plaintiffs—all Catholic
entities—to violate their sincerely held religious beliefs by providing, paying for, and/or
facilitating access to those services.  American history and tradition, embodied in the First
Amendment to the United States Constitution and the Religious Freedom Restoration Act
("RFRA"), safeguard religious entities from such overbearing and oppressive governmental
action.  Plaintiffs therefore seek relief in this Court to protect this most fundamental of American
rights.

2.    Plaintiffs are Catholic religious entities that provide a wide range of spiritual,
educational, and social services to residents in the greater St. Louis community, Catholic and
non-Catholic alike.  For example, Plaintiff Archdiocese of St. Louis is a Missouri nonprofit
corporation and is the civil law corporation for the community of Roman Catholics under the
pastoral care of Archbishop Robert J. Carlson.  The Archdiocese not only provides pastoral care
and spiritual guidance for over 520,000 Catholics, but also serves individuals throughout the St.
Louis area through its schools and multiple charitable programs.  The Archdiocese's programs
serve those who are most often overlooked in the community, including those with disabilities,
those challenged by an unexpected prenatal diagnosis, those re-entering society after
imprisonment, and those poor and marginalized with nowhere else to turn.  The mission of the
Archdiocese is carried out both by the Archdiocese on its own and through the work of its

affiliated corporations (collectively with the Archdiocese, "Archdiocesan Entities"), including Plaintiff Catholic Charities of St. Louis ("Catholic Charities").  Catholic Charities, the largest non-governmental social service provider in the region, offers a host of social services to thousands in need throughout the greater St. Louis area.  For those citizens in the community who could not otherwise afford them, Catholic Charities provides free physical and mental health care, legal assistance, immigration assistance, employment training, early childhood services, education, counseling, emergency shelter, housing, and dental services.

3.    Plaintiffs' work is in every respect guided by and consistent with Roman Catholic belief, including the requirement that they serve those in need, regardless of their religion.  This is perhaps best captured by words attributed to St. Francis of Assisi: "Preach the Gospel at all times.  Use words if necessary."  As Pope Benedict has more recently put it, "Love for widows and orphans, prisoners, and the sick and needy of every kind, is as essential to [the Catholic Church] as the ministry of the sacraments and preaching of the Gospel.  The Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Pope Benedict XVI, *Deus Caritas Est* ¶ 22 (2006).  Or as Cardinal James Hickey, former Archbishop of Washington, once commented on the role of Catholic educators: "We do not educate our students because *they* are Catholic; we educate them because *we* are Catholic."  Thus, Catholic individuals and organizations consistently work to create a more just community by serving any and all neighbors in need.

4.    Catholic Church teachings also uphold the firm conviction that sexual union should be reserved to married couples who are so committed to one another that they are open to the creation of life; thus, artificial interference with the creation of life, including through abortion, sterilization, and contraceptives, is contrary to Catholic doctrine.

5.    Defendants  have promulgated various rules (collectively, "the U.S. Government Mandate") that force Plaintiffs to violate their sincerely held religious beliefs.  Under the U.S. Government Mandate, many Catholic and other religious organizations are required to provide health plans to their employees that include and/or facilitate coverage for abortion-inducing drugs, sterilization, and contraception in violation of their sincerely held religious beliefs. Ignoring broader religious exemptions from other federal laws, the Government has crafted a narrow exemption to this Mandate for certain "religious employers" who can convince the Government that they satisfy four criteria:

- "The inculcation of religious values is the purpose of the organization";

- "The organization primarily employs persons who share the religious tenets of the organization";

- "The organization primarily serves persons who share the religious tenets of the organization"; and

- "The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."

Thus, in order to safeguard their religious freedoms, religious employers must plead with government bureaucrats for a determination that they are sufficiently "religious."

6.    Plaintiff Archdiocese of St. Louis does not know whether the Government will conclude that it satisfies the definition of a "religious employer" under the impermissibly vague terms of the exemption.  And in order to find out, it must submit to an intrusive governmental investigation into whether, in the Government's view, the Archdiocese's "purpose" is the "inculcation of religious values"; whether it "primarily" employs "persons who share [its] religious tenets," even though it hires employees of all faiths; and whether it "primarily" serves persons who share its religious tenets, even though its schools, parishes, and social services are open to all.

7.   The definition of "religious employer," moreover, excludes Catholic Charities, even though it is a "religious" organization under any reasonable definition of the term. Consequently, to even attempt to qualify as a "religious employer," these Plaintiffs may be required to stop providing educational opportunities to non-Catholics, stop serving non-Catholics, and fire non-Catholic employees—actions that would betray their religious commitment to serving all in need without regard to religion and undermine the Church's vaunted tradition of service to others.  As Archbishop Carlson put it, "Catholic hospitals and Catholic charities and Catholic schools don't serve people because *they* are Catholic; we serve people because *we* are Catholic."

8.   The U.S. Government Mandate, including the exemption for certain "religious employers," is irreconcilable with the First Amendment, the Religious Freedom Restoration Act, and other laws.  The Government has not shown any compelling need to force Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing drugs, sterilization, and contraception, or for requiring Plaintiffs to submit to an intrusive governmental examination of their religious missions.  The Government also has not shown that the U.S. Government Mandate is narrowly tailored to advancing any interest in increasing access to these services, since these services are already widely available and nothing prevents the Government from making them even more widely available by providing or paying for them directly through a duly-enacted law.  The Government, therefore, cannot justify its decision to force Plaintiffs to provide, pay for, and/or facilitate access to these services in violation of their sincerely held religious beliefs.

9.      Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

I.      **PRELIMINARY MATTERS**

10.     Plaintiff Archdiocese of St. Louis is a Missouri nonprofit corporation with its principal place of business in St. Louis, Missouri.  The Archdiocese is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

11.     Plaintiff Catholic Charities is a Missouri nonprofit corporation affiliated with the Archdiocese.  Its principal place of business is in St. Louis, Missouri.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

12.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services ("HHS").  She is sued in her official capacity.

13.     Defendant Hilda Solis is the Secretary of the U.S. Department of Labor.  She is sued in her official capacity.

14.     Defendant Timothy Geithner is the Secretary of the U.S. Department of Treasury.  He is sued in his official capacity.

15.     Defendant U.S. Department of Health and Human Services is an executive agency of the United States within the meaning of RFRA and the Administrative Procedure Act ("APA").

16.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

17.     Defendant U.S. Department of Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

18.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702, 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 2000bb-1.

19.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants.  Absent a declaration resolving this controversy and the validity of the U.S. Government Mandate, Plaintiffs are uncertain as to their rights and duties in planning, negotiating, and/or implementing their group health insurance plans, their hiring and retention programs, and their social, educational, and charitable programs and ministries, as described below.

20.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

21.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

22.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

**A.   The Archdiocese**

23.     The Archdiocese encompasses over 180 parishes serving over 520,000 Catholics (or approximately 22 percent of the total population) in St. Louis and in Missouri's Franklin, Jefferson, Lincoln, Perry, St. Charles, St. Francois, Ste. Genevieve, St. Louis, Warren, and Washington counties.  The Archdiocese was incorporated in 2004 as a nonprofit corporation. The parishes of the Archdiocese and most of its 147 schools are affiliated but separately-incorporated entities.  The charitable work of the Archdiocese is also performed through a number of separate, affiliated corporations, including (among others) Catholic Charities.

24.     Archbishop Robert J. Carlson, formerly the Bishop of Saginaw, has led the Archdiocese since 2009.  Archbishop Carlson is assisted in his ministry by an auxiliary bishop, an auxiliary bishop-emeritus, and a staff of clergy, religious brothers and sisters, and lay people. The Archdiocesan Entities have over 5,600 benefits-eligible employees.  The Archdiocese does not know how many of its employees are Catholic.

25.     The Archdiocese operates a self-insured health plan.  That is, the Archdiocese does not contract with a separate insurance company that provides health care coverage to its employees.  Instead, the Archdiocese itself functions as the insurance company underwriting its employees' medical costs.  The Archdiocese purchases stop-loss coverage from a commercial insurance provider for its plan.  Plaintiff Catholic Charities also offers coverage through the Archdiocese's plan.

26.     Consistent with Church teachings, the plan does not cover abortion-inducing drugs, sterilization, or contraceptives.  In limited circumstances, the Archdiocese's health plan administrator can override the exclusion of certain drugs commonly used as contraceptives if a physician certifies that they were prescribed with the intent of treating certain medical conditions, not with the intent to prevent pregnancy.

27.     The Archdiocese's self-insured health plan does not meet the Affordable Care Act's definition of a "grandfathered" plan because, since March 23, 2010, the Archdiocese has terminated one of its two plan options, replacing it with an option offering a reduced level of benefits at a reduced premium.  Further, the Archdiocese has not included and does not include a statement in plan materials provided to participants or beneficiaries informing them that it believes its plan is a  grandfathered health plan within the meaning of section 1251 of the Affordable Care Act.  *See, e.g.*, 26 C.F.R. § 54.9815-1251T(a)(2)(i).

28.     The plan year for the Archdiocese (and the organizations it insures) begins on July 1.

29.     The Archdiocese carries out a tripartite spiritual, educational, and social service mission, reflecting the several dimensions of its ministry.  The spiritual ministry of the Archdiocese is conducted largely through its parishes.  Through the ministry of its priests, the Archdiocese ensures the regular availability of the sacraments to all Catholics living in or visiting the St. Louis area.  It also provides numerous other opportunities for prayer, worship, and faith formation.  In 2011, more than 700 adults and nearly 350 children received formation in the Catholic faith through parish-level and Archdiocesan classes, lectures, and retreats. Approximately 700 adults enter the Catholic Church each year through programs offered by the parishes of the Archdiocese.  In addition to overseeing the sacramental life of its parishes, the Archdiocese coordinates Catholic campus ministries at 3 colleges and universities within the geographic area of the Archdiocese.

30.     The Archdiocese conducts its educational mission through its schools.  The first Catholic school opened in St. Louis in 1818.  Today, there are 147 Catholic schools, which educate over 43,000 children, located within the Archdiocese.  The Archdiocese and its parishes operate 123 of these schools—12 high schools and 111 elementary schools—serving close to 30,000 students, and employing approximately 2,200 teachers and other school staff.  Twenty-four additional Catholic schools are independent from, but located within, the Archdiocese and fall under the spiritual jurisdiction of Archbishop Carlson.

31.     The Archdiocesan schools welcome students in all financial conditions, from all backgrounds, and of any or no faith.  In order to make a Catholic education available to as many children as possible, the Archdiocese expends substantial funds in tuition assistance programs; it

awarded over $15 million in tuition assistance to Archdiocesan schools for the 2011-2012 school year.  11 percent of the students in the Archdiocesan elementary schools and 13.2 percent of the students in the high schools are minorities.

32.     The Catholic educational system has demonstrated a particular dedication to teaching the underserved.  In one of Archbishop Joseph E. Ritter's first acts upon arrival in St. Louis, he instructed all pastors in the Archdiocese to end racial segregation in the parochial schools.  It would be almost another decade before the United States Supreme Court would follow suit for the nation's public schools.  Today, schools like Cardinal Ritter Prep High School and St. Frances Cabrini Academy Elementary School continue to exemplify the Catholic church's dedication to teaching urban, minority, and non-Catholic youth.  Cardinal Ritter, which has been committed to providing exemplary education to St. Louis' urban youth since 1979, currently serves 327 students, 99 percent of whom are minorities and over 80 percent of whom are not Catholic.  St. Frances Cabrini, representing a consolidation of parishes and schools and attending to a large immigrant and refugee population in St. Louis, serves over 185 students, 73 percent of whom are minorities and 59 percent of whom are not Catholic.  Schools like Cardinal Ritter College Prep High School and St. Frances Cabrini Academy Elementary School are no less an expression and outgrowth of genuine Catholic belief because they primarily serve non-Catholics.  Indeed, quite the opposite: the Archdiocese sees these schools as a vital part of its mission to offer to every student, in every place, a safe, morally sound, and academically rigorous education.

33.     The schools of the Archdiocese offer a unique educational experience.  As Cardinal Donald Wuerl, the Archbishop of Washington, has said about Catholic education, "We educate people not just for exams, but for life eternal.  We educate the whole person: mind,

body, and spirit."  To that end, the Archdiocesan schools have established three priorities that make them stand out from other educational institutions.  Students are taught faith—not just the basics of Christianity, but how to have a relationship with God that will remain with them after they leave their Catholic schools.  Service, the giving of one's time and effort to help others, is taught as both a requirement of true faith and good citizenship.  Finally, high academic standards help each student reach his or her potential.  Nationally, over 99 percent of students in Catholic high schools graduate.

34.     The success of the Archdiocese's approach to education is demonstrated by Rosati-Kain High School and St. Margaret of Scotland Elementary School.  Rosati-Kain High School is a college preparatory school for young women who want to be challenged and supported in their faith while acquiring  the knowledge and skills necessary to become their best selves and contributing in the spirit of Jesus Christ to a changing, multi-cultural world community.  In 2010-2011, the school had 399 students from 84 parishes.  St. Margaret of Scotland Elementary School is a Catholic grade school committed to providing an outstanding learning environment for children, pre-kindergarten through eighth grade, in which children are challenged to meet their academic potential and recognize their giftedness in body, mind, and spirit.  St. Margaret has over 350 students, of which 25 percent are non-Catholic, and 30 percent are minorities.  St. Margaret students consistently score higher than the national and archdiocesan average on standardized tests in Reading, Language Arts, Math, Science, and Social Studies.  St. Margaret is a Blue Ribbon school.

35.     Much of the social service work of the Archdiocese is performed through its parishes, which are separate corporations affiliated with the Archdiocese.  The parishes that comprise the Archdiocese maintain their own charitable efforts, serving the needs of their

communities with programs including employment and job training, adopt-a-family programs at Christmas, meals served to the homeless, and visits to nursing homes.  The Archdiocese oversees all of the social service work undertaken by its parishes.  Neither the Archdiocese nor its parishes keeps a tally of persons served through these outreach programs, nor do they request to know the religious affiliation of those served.

36.     In summary, the Archdiocese—and the entire Catholic Church—is committed to serving anyone in need, regardless of religion.

37.     In addition to serving individuals of all faiths, the Archdiocese also employs individuals of all faiths.

38.     The Archdiocese does not know how many of those it hires or serves are Catholic. In order to determine those statistics, the Archdiocese would be required to ask the religious affiliation of all individuals that it employs or serves.  That inquiry, however, would substantially burden the Archdiocese's religious exercise.

39.     It is therefore unclear whether the Government will conclude that the Archdiocese qualifies as a "religious employer" under the narrow exemption from compliance with the U.S. Government Mandate.

40.     Regardless of whether the Government concludes that the Archdiocese qualifies for the exemption, the Archdiocese is in every respect Roman Catholic.

41.     Moreover, determining whether an organization—such as the Archdiocese—qualifies for the exemption will require the Government to engage in an intrusive inquiry, based on an understanding of religion that is  inconsistent with the Catholic faith, into whether, in the view of the Government, (1) the Archdiocese's "purpose"  is the "inculcation of religious values," (2) whether the Archdiocese "primarily" employs "persons who share [its] religious

tenets," even though it hires employees of all faiths and does not know how many Catholics it employs, and (3) whether it "primarily" serves such people, even though its schools and social services are open to all.

42.     Regardless of outcome, the Archdiocese strongly objects to such an intrusive and misguided governmental investigation into its religious mission.

**B.   Catholic Charities**

43.     Catholic Charities, the largest non-governmental social service provider in the region, provided services to over 157,000 people in 2010, 76 percent of whom live below the poverty line.  Its purpose is to carry out the mandates of the Gospel and the social teaching of the church through works of Christian charity, service, and social justice by providing competent and caring social services, special assistance to those in great need, and programs of community outreach and advocacy using the skills and talents of professional staff and volunteers.  Catholic Charities pursues these goals through its own programs and through partnerships with parishes, community groups, and governmental agencies.

44.     Catholic Charities is comprised of eight agencies offering more than one hundred programs, providing a panoply of services that include financial assistance, dental and medical care, pro bono legal aid, adult education, emergency shelters, care for the developmentally disabled, English as a Second Language courses, and many others.

45.     For example, St. Patrick Center is one of the programs operated by Catholic Charities.  It is the largest provider of homeless services in Missouri, with more than 20 housing, employment, and health programs, assisting nearly 9,000 people annually.  The center helps individuals and families achieve permanent, positive change in their lives through safe and affordable housing, sound mental and physical health, and employment and financial stability.

46.     Queen of Peace Center, another of Catholic Charities' flagship programs, provides services for women and their children in St. Louis who experience violence, substance abuse, or homelessness.  The program served 1,400 women and children in 2010.  Its services include trauma counseling, housing, transportation, and childcare.  Both residential and outpatient services are offered at four sites through fourteen programs.

47.     Catholic Charities is a corporation affiliated with the Archdiocese.

48.     Catholic Charities has nearly 1600 employees.  While Catholic Charities asks its employees to assent to Catholic teachings, it does not inquire about the religious commitments of its applicants for employment, and, as a result, it does not know how many of its employees are Catholic.

49.     Catholic Charities serves people in need without regard to their religion.  It does not ask whether people whom it serves are Catholic and, therefore, it does not know whether they are Catholic.

50.     On information and belief, a majority of the people served by Catholic Charities are not Catholic.

51.     Catholic Charities itself does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

52.     Catholic Charities employees are offered health insurance through the Archdiocese's health plan.

II.   **STATUTORY AND REGULATORY BACKGROUND**

   **A.  Statutory Background**

   53.    In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively, the "Affordable Care Act" or the "Act").  The Affordable Care Act established many new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents."  42 U.S.C. § 300gg-91(a)(1).

   54.    As relevant here, the Act requires an employer's group health plan to cover certain women's "preventive care."  Specifically, it indicated that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for—(4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."  Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C. § 300gg-13(a)(4)).  Because the Act prohibits "cost sharing requirements," the health plan must pay for the full costs of these "preventive care" services without any deductible or co-payment.

   55.    "[T]he Affordable Care Act preserves the ability of individuals to retain coverage under a group health plan or health insurance coverage in which the individual was enrolled on March 23, 2010."  Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,731 (July 19, 2010) ("Interim Final Rules"); 42 U.S.C. § 18011.

These so-called "grandfathered health plans do not have to meet the requirements" of the U.S. Government Mandate.  75 Fed. Reg. at 41,731.  HHS estimates that "98 million individuals will be enrolled in grandfathered group health plans in 2013."  *Id.* at 41,732.

56.     Violations of the Affordable Care Act can subject an employer and an insurer to substantial monetary penalties.

57.     Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a), (c)(1).

58.     Additionally, under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to an assessment of $100 a day per individual.  *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that this applies to employers who violate the "preventive care" provision of the Affordable Care Act).

59.     Under the Public Health Service Act, the Secretary of HHS may impose a monetary penalty of $100 a day per individual where an insurer fails to provide the coverage required by the U.S. Government Mandate.  *See* 42 U.S.C. § 300gg-22(b)(2)(C)(i); *see also* Cong. Research Serv., RL 7-5700 (asserting that this penalty applies to insurers who violate the "preventive care" provision of the Affordable Care Act).

60.     ERISA may provide for additional penalties.  Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.  Similarly, the Secretary of Labor may bring an enforcement

action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA. *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these penalties can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

61.     Several of the Act's provisions, along with other federal statutes, reflect a clear congressional intent that the executive agency charged with identifying the "preventive care" required by § 300gg-13(a)(4) should exclude all abortion-related services. The Act itself states that "nothing in this title (or any amendment made by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i). And the Act left it to "the issuer of a qualified health plan," not the Government, "[to] determine whether or not the plan provides coverage of [abortion]." *Id.* § 18023(b)(1)(A)(ii).

62.     Likewise, the Weldon Amendment, which has been included in every HHS and Department of Labor appropriations bill since 2004, prohibits certain agencies from discriminating against an institution based on that institution's refusal to provide abortion-related services. Specifically, it states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

63.     The legislative history of the Act also demonstrates a clear congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services.  For example, the House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak prohibiting the use of federal funds for abortion services.  *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009).  The Senate version, however, lacked that restriction.  S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009).  To avoid a filibuster in the Senate, congressional proponents of the Act engaged in a procedure known as "budget reconciliation" that required the House to adopt the Senate version of the bill largely in its entirety.  Congressman Stupak and other pro-life House members, however, indicated that they would refuse to vote for the Senate version because it failed adequately to prohibit federal funding of abortion.  In an attempt to address these concerns, President Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services.  *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

64.     The Act was, therefore, passed on the central premise that all agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion.  *Id.*   That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he indicated that his Administration would honor the consciences of those who disagree with abortion, and draft sensible conscience clauses.

### B.    Regulatory Background – Defining "Preventive Care" and the Narrow Exemption

65.     In a span of less than two years, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience.  The U.S. Government Mandate, moreover, was implemented contrary to the normal procedural rules governing the promulgation and implementation of rules of this magnitude.

18

66.     In particular, on July 19, 2010, Defendants issued initial interim final rules concerning § 300gg-13(a)(4)'s requirement that group health plans provide coverage for women's "preventive care."  Interim Final Rules, 75 Fed. Reg. 41,726.  Defendants dispensed with notice-and-comment rulemaking for these rules.  Even though federal law had never required coverage of abortion-inducing drugs, sterilization, or contraceptives, Defendants claimed both that the APA did not apply to the relevant provisions of the Affordable Care Act and that "it would be impracticable and contrary to the public interest to delay putting the provisions in these interim final regulations in place until a full public notice and comment process was completed."  *Id.* at 41,730.

67.     The interim final rules referred to the Affordable Care Act's statutory language. They indicated that "a group health plan . . . must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements (such as a copayment, coinsurance, or deductible) with respect to those items or services: . . . (iv) With respect to women, to the extent not described in paragraph (a)(1)(i) of this section, evidence-informed preventive care and screenings provided for in comprehensive guidelines supported by the Health Resources and Services Administration."  Interim Final Rules, 75 Fed. Reg. at 41,759 (codified at 45 C.F.R. § 147.130(a)(iv)).

68.     The interim final rules, however, failed to identify the women's "preventive care" that Defendants planned to require employer group health plans to cover.  42 U.S.C. § 300gg-13(a)(4).  Instead, Defendants noted that "[t]he Department of HHS [was] developing these guidelines and expects to issue them no later than August 1, 2011."  Interim Final Rules, 75 Fed. Reg. at 41,731.

69.    Defendants permitted concerned entities to provide written comments about the interim final rules.  *See id.* at 41,726.  But, as Defendants have conceded, they did not comply with the notice-and-comment requirements of the APA.  *Id.* at 41,730.

70.    In response, several groups engaged in a lobbying effort to persuade Defendants to include various contraceptives and abortion-inducing drugs in the "preventive care" requirements for group health plans.  *See, e.g.*, Press Release, Planned Parenthood, Planned Parenthood Supports Initial White House Regulations on Preventive Care (July 14, 2010), *available at* http://www.plannedparenthood.org/about-us/newsroom/press-releases/planned-parenthood-supports-initial-white-house-regulations-preventive-care-highlights-need-new-33140.htm.  Other commenters noted that "preventive care" could not reasonably be interpreted to include such practices.  These groups indicated that pregnancy was not a disease that needed to be "prevented," and that a contrary view would intrude on the sincerely held beliefs of many religiously affiliated organizations.  *See, e.g.*, Comments of U.S. Conference of Catholic Bishops, at 1-2 (Sept. 17, 2010), *available at* http://old.usccb.org/ogc/preventive.pdf.

71.    On August 1, 2011, HHS announced the "preventive care" services that group health plans would be required to cover.  *See* Press Release, HHS, Affordable Care Act Ensures Women Receive Preventive Services at No Additional Cost (Aug. 1, 2011), *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html.  Again acting without notice-and-comment rulemaking, HHS announced these guidelines through a press release rather than enactments in the Code of Federal Regulations or statements in the Federal Register.

72.    The press release made clear that the guidelines were developed by a non-governmental "independent" organization, the Institute of Medicine ("IOM").  *See id.*  In developing the guidelines, IOM invited certain groups to make presentations on preventive care.

On information and belief, no groups that oppose government-mandated coverage of abortion, contraception, and related education and counseling were among the invited presenters.  Comm. on Preventive Servs. for Women, Inst. of Med., Clinical Preventive Services for Women app. B at 217-21 (2011), http://www.nap.edu/openbook.php?record_id=13181&page=R1.

73.    The IOM's own report, in turn, included a dissent that suggested that the IOM's recommendations were made on an unduly short time frame dictated by political considerations, through a process that was largely subject to the preferences of the committee's composition, and without the appropriate transparency for all concerned persons.

74.    In direct contradiction of the central compromise necessary for the Affordable Care Act's passage and President Obama's promise to protect religious liberty, HHS's guidelines required insurers and group health plans to cover  "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  *See* Health Res. Servs. Admin., Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines/ (last visited Apr. 25, 2012).  FDA-approved contraceptives that qualify under these guidelines include drugs that induce abortions.  For example, the FDA has approved "emergency contraceptives" such as the morning-after pill (otherwise known as Plan B), which can prevent an embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or ella), which likewise can induce abortions.

75.    A few days later, on August 3, 2011, Defendants issued amendments to the interim final rules that they had enacted in July 2010.  *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621 (Aug. 3, 2011).  Defendants issued the amendments

again without notice-and-comment rulemaking on the same grounds that they had provided for

bypassing the APA with the original rules.  *See id.* at 46,624.

76.     When announcing the amended regulations, Defendants ignored the view that

"preventive care" should exclude abortion-inducing drugs, sterilization, or contraceptives that do

not prevent disease.  Instead, they noted only that "commenters [had] asserted that requiring

group health plans sponsored by religious employers to cover contraceptive services that their

faith deems contrary to its religious tenets would impinge upon their religious freedom."  *Id.* at

46,623.

77.     Defendants then sought "to provide for a religious accommodation that

respect[ed]" only "the unique relationship between a house of worship and its employees in

ministerial positions."  *Id.*

78.     Specifically, the regulatory exemption ignores definitions of religious employers

already existing in federal law and, instead, covers only those employers whose purpose is to

inculcate religious values, and who employ and serve primarily individuals of the same religion.

It provides in full:

> (A) In developing the binding health plan coverage guidelines
> specified in this paragraph (a)(1)(iv), the Health Resources and
> Services Administration shall be informed by evidence and may
> establish exemptions from such guidelines with respect to group
> health plans established or maintained by religious employers and
> health insurance coverage provided in connection with group
> health plans established or maintained by religious employers with
> respect to any requirement to cover contraceptive services under
> such guidelines.
>
> (B) For purposes of this subsection, a "religious employer" is an
> organization that meets all of the following criteria:
> (1) The inculcation of religious values is the purpose of the
> organization.
> (2) The organization primarily employs persons who share the
> religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.
(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

*Id.* at 46,626 (codified at 45 C.F.R. § 147.130(a)(iv)(A)-(B)).

79.     The exemption excludes the health plans of all other religiously affiliated employers that view their missions as providing charitable, educational, and employment opportunities to all those who request it, regardless of their religious faith.

80.     Moreover, determining whether an organization is sufficiently "religious" to qualify for the exemption requires an unconstitutionally invasive inquiry into an organization's religious beliefs and practices.  For example, the Government must determine the "religious tenets" of an organization and the individuals it employs and serves; it must determine whether the organization "primarily" employs and "primarily" serves individuals who "share" the organization's  "religious tenets"; and it must determine whether "the purpose" of the organization is the "inculcation of religious values."

81.     When issuing this interim final rule, Defendants did not explain why they constructed such a narrow religious exemption.  Nor did Defendants explain why they refused to incorporate other "longstanding Federal laws to protect conscience" that President Obama's executive order previously had promised to respect.  *See* Exec. Order 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).  ERISA, for example, has long excluded "church plans" from its requirements, more broadly defined to cover civil law corporations  that share religious bonds with a church.  *See* 29 U.S.C. §§ 1002(33)(C)(iv), 1003.  Likewise, the Affordable Care Act's requirement that all individuals maintain minimum essential coverage excludes those individuals who have a religious objection to receiving benefits from public or private insurance.  26 U.S.C.

23

§§ 1402(g)(1), 5000A(d)(2).  Nor did Defendants consider whether they had a compelling interest to require religiously affiliated employers to include services in their health plans that were contrary to their religious beliefs, or whether Defendants could achieve their views of sound policy in a more religiously accommodating manner.

83.     Suggesting that they were open to good-faith discussion, Defendants once again permitted parties to provide comments to the amended rules.  Numerous organizations expressed the same concerns that they had before, noting that the mandated services should not be viewed as "preventive care."  They also explained that the religious exemption was "narrower than any conscience clause ever enacted in federal law, and narrower than the vast majority of religious exemptions from state contraceptive mandates."  Comments of U.S. Conference of Catholic Bishops, at 1-2 (Aug. 31, 2011), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-to-hhs-on-preventive-services-2011-08.pdf.  Others submitted their own comments emphasizing that "[p]regnancy is not a disease, and drugs and surgeries to prevent it are not basic health care that the government should require all Americans to purchase."  Comments of Archdiocese of Washington, at 1 (Sept. 30, 2011), *available at* http://www.dol.gov/ebsa/pdf/1210-AB44a-14694.pdf.

83.     Three months later, "[a]fter evaluating [the new] comments" to the interim final rules, Defendants gave their response.  They did not request further discussion or make attempts at compromise.  Nor did they explain the basis for their decision.  Instead, Defendant Sebelius issued a short, Friday-afternoon press release, announcing, with little analysis or reasoning, that HHS had decided to keep the exemption unchanged, but creating a temporary enforcement safe harbor whereby "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August

24

1, 2013, to comply with the new law."  *See* Press Release, HHS, A Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (Jan. 20, 2012), *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html.  As noted by Cardinal Timothy Dolan, the Archbishop of New York, the release effectively gave objecting religious institutions "a year to figure out how to violate [their] consciences."  Taken together, these various rules and press releases amount to a mandate that requires most religiously affiliated organizations to provide coverage for services to their employees that are directly contrary to their religious beliefs.

84.     On February 10, 2012, after a continuing public outcry against the U.S. Government Mandate and its exceedingly narrow conscience protections, the White House held a press conference and issued another press release about the U.S. Government Mandate.  The White House announced that it had come up with a policy to "accommodate" religious objections to the U.S. Government Mandate, according to which the insurance companies of religious organizations that object to providing coverage for abortion-inducing drugs, sterilization, or contraceptives "will be required to directly offer . . . contraceptive care [to plan participants] free of charge."  White House, *Fact Sheet: Women's Preventive Services and Religious Institutions* (Feb. 10, 2012), *available at*  http://www.whitehouse.gov/the-press-office/2012/02/10/fact-sheet-women-s-preventive-services-and-religious-institutions.

85.     Despite objections that this "accommodation" did nothing of substance to protect the right of conscience, when asked if there would be further room for compromise, White House Chief of Staff Jacob Lew responded: "No, this is our plan."  David Eldridge & Cheryl Wetzstein, *White House Says Contraception Compromise Will Stand*, The Washington Times,

Feb. 12, 2012, http://www.washingtontimes.com/news/2012/feb/12/white-house-birth-control-compromise-will-stand/print/.

86.     Defendants subsequently explained in the Federal Register that they "plan[ned] to initiate a rulemaking to require issuers to offer insurance without contraception coverage to [an objecting religious] employer (or plan sponsor) and simultaneously to offer contraceptive coverage directly to the employer's plan participants (and their beneficiaries) who desire it, with no cost-sharing."  Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).  The Federal Register further asserted that the rulemaking would "achieve the same goals for self-insured group health plans."  *Id.*

87.     Defendants then "finalize[d], without change," the interim final rules containing the religious employer exemption, 77 Fed. Reg. at 8729, and issued guidelines regarding the previously announced "temporary enforcement safe harbor" for "non-exempted, non-profit religious organizations with religious objections to such coverage."  *Id.* at 8725; *see* Ctr. for Consumer Info. & Ins. Oversight, Guidance on the Temporary Enforcement Safe Harbor (Feb. 10, 2012), *available at* http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf.

88.     On March 16, 2012,  Defendants issued an Advance Notice of Proposed Rulemaking ("ANPRM") seeking comment on various ways to structure the proposed accommodation.  Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. 16,501 (Mar. 21, 2012).  The proposed scenarios require an "independent entity" to provide coverage for the objectionable services at no cost to the participants.  But private entities do not provide insurance coverage "for free."  Moreover, even if these proposals were adopted, they

would still require religious organizations to provide, pay for, and/or facilitate access to the objectionable services.   Finally, it is also unclear whether the Government has statutory authority to implement each of the possibilities referenced in the ANPRM.

89.     The ANPRM does not alter existing law.  It merely states an intention to do so at some point in the future.  But a promise to change the law, whether issued by the White House or in the form of an ANPRM does not, in fact, change the law.  The U.S. Government Mandate is therefore the current, operative law.  Plaintiffs have until the start of the next plan year following August 1, 2013, to come into compliance with this law.

III.   **THE U.S. GOVERNMENT MANDATE IMPOSES AN IMMEDIATE AND SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGIOUS LIBERTY**

A.   **The U.S. Government Mandate Substantially Burdens Plaintiffs' Religious Beliefs**

90.     Responding to the U.S. Government Mandate, Archbishop Carlson has noted that it is "an alarming and serious matter that strikes at our fundamental rights to religious freedom." And indeed it is.  Since the founding of this country, our society and legal system have recognized that individuals and institutions are entitled to freedom of conscience and religious practice.  As noted by Thomas Jefferson, "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of civil authority."

91.     The U.S. Government Mandate seeks to require Plaintiffs to provide, pay for, and/or facilitate access to services that are contrary to their religious beliefs.  It thus severely burdens Plaintiffs' firmly held religious beliefs.

92.     The U.S. Government Mandate also seeks to compel Plaintiffs to fund related "patient education and counseling for all women with reproductive capacity."  It therefore

compels Plaintiffs to pay for, provide, and/or facilitate speech that is contrary to their firmly held religious beliefs.

93.     Although the U.S. Government Mandate contains a narrow religious exemption, in order to qualify, religious organizations must submit to an invasive governmental inquiry regarding their purpose and religious beliefs.  Requiring Plaintiffs to submit to this government-conducted religious test likewise substantially burdens their firmly held religious beliefs.

94.     It is unclear how the Government defines or will interpret "the purpose" of an organization.

95.     It is unclear how the Government defines or will interpret vague terms, such as "primarily," "share" and "religious tenets."

96.     It is unclear how the Government will ascertain the "religious tenets" of an organization, those it employs, and those it serves.

97.     It is unclear how much overlap the Government will require for religious tenets to be "share[d]."

98.     Any attempt by Plaintiffs to qualify for the narrow religious employer exemption by restricting their charitable and educational mission to coreligionists would have devastating effects on the communities Plaintiffs serve.

99.     Indeed, the Government does not even provide Plaintiffs the option to attempt to avoid the U.S. Government Mandate by exiting the health care market.  Eliminating its employee group health plan or refusing to provide plans that cover abortion-inducing drugs, sterilization, or contraceptives would expose each Plaintiff to substantial annual fines.  It is no "choice" to leave those employees scrambling for health insurance while subjecting Plaintiffs to significant fines

for breaking the law.  Yet that is what the U.S. Government Mandate requires for Plaintiffs to adhere to their religious beliefs.

100.    The U.S. Government Mandate also inhibits Plaintiffs' ability to hire and retain employees, attract students, and solicit charitable contributions.

101.    Nor would the opaque, promised "accommodation"—even if it were law, which it is not—relieve Plaintiffs from the unconscionable  position in which the U.S. Government Mandate currently puts them, for numerous reasons.

102.    First, the promised "accommodation" would not alter the fact that Plaintiffs would be required to facilitate practices that run directly contrary to their beliefs.  Catholic teaching does not simply require Catholic institutions to avoid directly paying for practices that are viewed as intrinsically immoral.  It also requires them to avoid actions that facilitate those practices.

103.    Second, any requirement that insurance companies or other independent entities provide preventive services "free of charge" is illusory.  For-profit entities do not provide services for free.  Instead, increased costs are passed through to consumers in the form of higher premiums or fees.  Under the proposed accommodation, doctors will still have to be paid to prescribe the objectionable services and drug companies and pharmacists will still have to be paid for providing them.  Hypothetical future savings cannot be used to pay those fees; rather, the money will necessarily be derived from increased premiums or fees.

104.    Third, the "accommodation" does not affect the narrow exemption applicable to "religious employers."  To qualify for that narrow exemption, religious organizations must submit to an invasive governmental inquiry.  Requiring Plaintiffs to submit to this government-conducted test to determine if Plaintiffs are sufficiently religious is inappropriate and substantially burdens their firmly held religious beliefs.

105.    Finally, as noted below, the U.S. Government Mandate is burdening Plaintiffs

religious beliefs right now.  Plaintiffs cannot possibly wait until August 1, 2013, to determine

how to respond to the U.S. Government Mandate.

106.    In short, while the President claimed to have "f[ou]nd a solution that works for

everyone" and that ensures that "[r]eligious liberty will be protected," in reality, his promised

"accommodation" does neither.  Unless and until this issue is definitively resolved, the U.S.

Government Mandate does and will continue to impose a substantial burden on Plaintiffs

religious beliefs.

**B.    The U.S. Government Mandate Is Not a Neutral Law of General Applicability**

107.    The U.S. Government Mandate is not a neutral law of general applicability.  It

offers multiple exemptions from its requirement that employer-based health plans include or

facilitate coverage for abortion-inducing drugs, sterilization, contraception, and related education

and counseling.  It was, moreover, implemented by and at the behest of individuals and

organizations who disagree with certain religious beliefs regarding abortion and contraception,

and thus targets religious organizations for disfavored treatment.

108.    For example, the U.S. Government Mandate exempts all "grandfathered" plans

from its requirements.

109.    The Government has also crafted a religious exemption to the U.S. Government

Mandate that favors certain religions over others.  As noted, it applies only to plans sponsored by

religious organizations that have, as their "purpose," the "inculcation of religious values"; that

"primarily" serve individuals that share their "religious tenets"; and that "primarily" employ such

individuals.  45 C.F.R. § 147.130(a)(iv)(B).

110.    The U.S. Government Mandate, moreover, was promulgated by Government

officials, and supported by non-governmental organizations, who strongly oppose certain

Catholic teachings and beliefs.  For example, on October 5, 2011, Defendant Sebelius spoke at a

fundraiser for NARAL Pro-Choice America.  Defendant Sebelius has long supported abortion

rights and criticized Catholic teachings and beliefs regarding abortion and contraception.

NARAL Pro-Choice America is a pro-abortion organization that likewise opposes many Catholic

teachings.  At that fundraiser, Defendant Sebelius criticized individuals and entities whose beliefs

differed from those held by her and the other attendees of the NARAL Pro-Choice America

fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions

would champion the cause of widely available, widely affordable contraceptive services?  Not so

much."

111.    Consequently, on information and belief, Plaintiffs allege that the purpose of the

U.S. Government Mandate, including the narrow exemption, is to discriminate against religious

institutions and organizations that oppose abortion and contraception.

**C.   The U.S. Government Mandate Is Not the Least Restrictive Means of Furthering a
      Compelling Governmental Interest**

112.    The U.S. Government Mandate is not narrowly tailored to promoting a

compelling governmental interest.

113.    The Government has no compelling interest in forcing Plaintiffs to violate their

sincerely held religious beliefs by requiring them to provide, pay for, or facilitate access to

abortion-inducing drugs, sterilization, contraceptives, and related education and counseling.  The

Government itself has relieved numerous other employers from this requirement by exempting

grandfathered plans and plans of employers it deems to be sufficiently religious. Moreover, these

services are widely available in the United States.  The U.S. Supreme Court has held that

individuals have a constitutional right to use such services.  And nothing that Plaintiffs do inhibits

any individual from exercising that right.

31

114.     Even assuming the interest was compelling, the Government has numerous alternatives to furthering that interest other than forcing Plaintiffs to violate their religious beliefs. For example, the Government could have provided or paid for the objectionable services itself through other programs established by a duly enacted law.  Or, at a minimum, it could have created a broader exemption for religious employers, such as those found in numerous state laws throughout the country and in other federal laws.  The Government therefore cannot possibly demonstrate that requiring Plaintiffs to violate their consciences is the least restrictive means of furthering its interest.

115.     The U.S. Government Mandate, moreover, would simultaneously undermine both religious freedom—a fundamental right enshrined in the U.S. Constitution—and access to the wide variety of social and educational services that Plaintiffs provide.  The Archdiocese educates children who otherwise may not have adequate educational opportunities, and Catholic Charities provides a range of social services to the citizens of St. Louis.  As  President Obama acknowledged in his February 10th announcement, religious organizations like Plaintiffs do "more good for a community than a government program ever could."  The U.S. Government Mandate, however, puts these good works in jeopardy.

116.     That is unconscionable.  Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

### D.   The U.S. Government Mandate's Religious Employer Exemption Excessively Entangles the Government in Religion and Interferes with Religious Institutions' Religious Doctrine

117.     The U.S. Government Mandate's religious employer exemption further excessively entangles the Government in defining the purpose and religious tenets of each organization and its employees and beneficiaries.

118.   In order to determine whether the Archdiocese—or any other religious organization—qualifies for the exemption, the Government would have to identify the organization's "religious tenets" and determine whether "the purpose" of the organization is to "inculcate" those tenets.

119.   The Government would then have to conduct an inquiry into the practices and beliefs of the individuals that the organization ultimately employs and educates.

120.   The Government would then have to compare and contrast those religious practices and beliefs to determine whether and how many of them are "share[d]."

121.   Regardless of outcome, this inquiry is unconstitutional, and Plaintiffs strongly object to such an intrusive governmental investigation into an organization's religious mission.

122.   The religious employer exemption is based on an improper Government determination that "inculcation" is the only legitimate religious purpose.

123.   The Government should not base an exemption on an assessment of the "purity" or legitimacy of an institution's  religious purpose.

124.   By limiting that legitimate purpose to "inculcation," at the expense of other sincerely held religious purposes, the U.S. Government Mandate interferes with religious autonomy.  Religious institutions have the right to determine their own religious purpose, including religious purposes broader than "inculcation," without Government interference and without losing their religious liberties.

125.   Defining religion based on employing and serving primarily people who share the organization's religious tenets directly contradicts Plaintiffs sincerely held religious beliefs regarding their religious mission to serve all people, regardless of whether or not they share the same faith.

126.   This narrow exemption may protect some religious organizations.  But it does not protect the many Catholic and other religious organizations that educate students of all faiths, provide vital social services to individuals of all faiths, and employ individuals of all faiths.  The U.S. Government Mandate thus discriminates against such religious organizations because of their religious commitment to educate, serve, and employ people of all faiths.

127.   It is unclear whether, if an entity qualifies as a "religious employer" for purposes of the exemption, any affiliated corporation that provides coverage to its employees through the exempt entity's group health plan would also receive the benefit of the exemption.  Certain Preventive Services Under the Affordable Care Act, 77 Fed. Reg. at 16,502 (Mar. 21, 2012).

128.   It is unclear whether, if the Archdiocese qualifies as a "religious employer" under the exemption to the U.S. Government Mandate, any affiliated corporation that provides coverage to its employees through the Archdiocese's group health plan would therefore also receive the benefit of the exemption.

### E.   The U.S. Government Mandate Is Causing Present Hardship to Plaintiffs That Should Be Remedied by a Court

129.   The U.S. Government Mandate is already causing serious, ongoing hardship to Plaintiffs that merits judicial relief now.

130.   Health plans do not take shape overnight.  A number of analyses, negotiations, and decisions must occur each year before Plaintiffs can offer a health benefits package to their employees.  For example, an employer that is self-insured—like the Archdiocese—must work with actuaries to evaluate its funding reserves, and then negotiate with a third-party administrator to determine the cost of the products and services it wants to offer its employees.

131.   Under normal circumstances, Plaintiffs must begin the process of determining their health care package for a plan year nearly one year before the plan year begins.  The

multiple levels of uncertainty surrounding the U.S. Government Mandate make this already lengthy process even more complex.

132.   For example, if Plaintiffs decide that the only tolerable option is to attempt to qualify as a "religious employer" under the U.S. Government Mandate, they will need to undertake a major overhaul of their corporate structures, hiring practices, and the scope of their programming.  This process could take years.

133.   In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to annual government fines and penalties.  Plaintiffs require time to budget for any such additional expenses.

134.   The U.S. Government Mandate and its uncertain legality, moreover, undermine Plaintiffs' ability to hire and retain employees.

135.   Plaintiffs therefore need judicial relief now in order to prevent the serious, ongoing harm that the U.S. Government Mandate is already imposing on them.

IV.   **CAUSES OF ACTION**

**COUNT I**
**Substantial Burden on Religious Exercise**
**in Violation of RFRA**

136.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

137.   RFRA prohibits the Government from substantially burdening an entity's exercise of religion, even if the burden results from a rule of general applicability, unless the Government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

138.   RFRA protects organizations as well as individuals from Government-imposed substantial burdens on religious exercise.

139.   RFRA applies to all federal law and the implementation of that law by any branch, department, agency, instrumentality, or official of the United States.

140.   The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.

141.   In order to qualify for the "religious employer" exemption to the U.S. Government Mandate, Plaintiffs must submit to an intrusive government inquiry into their religious beliefs.

142.   The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

143.   The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

144.   Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering a compelling governmental interest.

145.   By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, Defendants have violated RFRA.

146.   Plaintiffs have no adequate remedy at law.

147.   Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT II**
**Substantial Burden on Religious Exercise in Violation of**
**the Free Exercise Clause of the First Amendment**

148.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

149.   The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

150. The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

151. The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate practices and speech that are contrary to their religious beliefs.

152. In order to qualify for the "religious employer" exemption to the U.S. Government Mandate, Plaintiffs must submit to an intrusive government inquiry into their religious beliefs.

153. The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

154. The U.S. Government Mandate is not a neutral law of general applicability because it is riddled with exemptions for which there is not a consistent, legally defensible basis. It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing drugs, sterilization, contraception, and related education and counseling.

155. The U.S. Government Mandate is not a neutral law of general applicability because it discriminates against certain religious viewpoints and targets certain religious organizations for disfavored treatment.  Defendants enacted the U.S. Government Mandate despite being aware of the substantial burden it would place on Plaintiffs' exercise of religion.

156. The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech and to freedom from excessive government entanglement with religion.

157. The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

158.   The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

159.   By enacting and threatening to enforce the U.S. Government Mandate, the Government has burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

160.   Plaintiffs have no adequate remedy at law.

161.   Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT III**
**Excessive Entanglement in Violation of the**
**Free Exercise and Establishment Clauses of the First Amendment**

162.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

163.   The Free Exercise Clause and the Establishment Clause of the First Amendment prohibit intrusive government inquiries into the religious beliefs of individuals and institutions, and other forms of excessive entanglement between religion and Government.

164.   This prohibition on excessive entanglement protects organizations as well as individuals.

165.   In order to qualify for the exemption to the U.S. Government Mandate for "religious employers," entities must submit to an invasive government investigation into an organization's religious beliefs, including whether the organization's "purpose" is  the "inculcation of religious values" and whether the organization "primarily employs" and "primarily serves" individuals who share the organization's religious tenets.

166.   The U.S. Government Mandate thus requires the Government to engage in invasive inquiries and judgments regarding questions of religious belief or practice.

167.   The U.S. Government Mandate results in an excessive entanglement between religion and Government.

168.   The U.S. Government Mandate is therefore unconstitutional and invalid.

169.   The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

170.   Plaintiffs have no adequate remedy at law.

171.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT IV**
**Religious Discrimination in Violation of the**
**Free Exercise and Establishment Clauses of the First Amendment**

172.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

173.   The Free Exercise Clause and the Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

174.   This mandate of equal treatment protects organizations as well as individuals.

175.   The U.S. Government Mandate's narrow exemption for certain "religious employers" but not others discriminates on the basis of religious views or religious status.

176.   The U.S. Government Mandate's definition of religious employer likewise discriminates among different types of religious entities based on the nature of those entities' religious beliefs or practices.

177.   The U.S. Government Mandate's definition of religious employer furthers no compelling governmental interest.

178.   The U.S. Government Mandate's definition of religious employer is not narrowly tailored to further a compelling governmental interest.

179.   The enactment and impending enforcement of the U.S. Government Mandate violate the Free Exercise Clause and the Establishment Clause of the First Amendment.

180.   Plaintiffs have no adequate remedy at law.

181.   The U.S. Government Mandate and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT V**
**Interference in Matters of Internal Church Governance in Violation of**
**the Free Exercise and Establishment Clauses of the First Amendment**

182.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

183.   The Free Exercise Clause and Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

184.   Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

185.   Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

186.   Plaintiffs are religious organizations affiliated with the Roman Catholic Church.

187.   The Catholic Church views abortion, sterilization, and contraception as intrinsically immoral, and prohibits Catholic organizations from condoning or facilitating those practices.

188.   Plaintiffs have abided and must continue to abide by the decision of the Catholic Church on these issues.

189.   The Government may not interfere with or otherwise question the final decision of the Catholic Church that its religious organizations must abide by these views.

190.   Plaintiffs have therefore made the internal decision that the health plans they offer to their employees may not cover, subsidize, or facilitate abortion, sterilization, or contraception.

191.   The U.S. Government Mandate interferes with Plaintiffs' internal decisions concerning their structure and mission by requiring them to facilitate practices that directly conflict with Catholic beliefs.

192.   The U.S. Government Mandate's interference with Plaintiffs' internal decisions affects their faith and mission by requiring them to facilitate practices that directly conflict with their religious beliefs.

193.   Because the U.S. Government Mandate interferes with the internal decision-making of Plaintiffs in a manner that affects Plaintiffs' faith and mission, it violates the Establishment Clause and the Free Exercise Clause of the First Amendment.

194.   Plaintiffs have no adequate remedy at law.

195.   Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VI
### Compelled Speech in Violation of
### the Free Speech Clause of the First Amendment

196.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

197.   The First Amendment protects against the compelled affirmation of any religious or ideological proposition that the speaker finds unacceptable.

198.   The First Amendment protects organizations as well as individuals against compelled speech.

199.   Expenditures are a form of speech protected by the First Amendment.

200. The First Amendment protects against the use of a speaker's money to support a viewpoint that conflicts with the speaker's religious beliefs.

201. The U.S. Government Mandate would compel Plaintiffs to provide health care plans to their employees that include or facilitate coverage of practices that violate their religious beliefs.

202. The U.S. Government Mandate would compel Plaintiffs to subsidize, promote, and facilitate education and counseling services regarding these practices.

203. By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs to publicly subsidize or facilitate the activity and speech of private entities that are contrary to their religious beliefs.

204. The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

205. The U.S. Government Mandate furthers no compelling governmental interest.

206. The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

207. Plaintiffs have no adequate remedy at law.

208. Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

### COUNT VII
### Failure to Conduct Notice-and-Comment Rulemaking and Improper Delegation in Violation of the APA

209. Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

210. The Affordable Care Act expressly delegates to an agency within Defendant HHS, the Health Resources and Services Administration, the authority to establish guidelines

concerning the "preventive care" that a group health plan and health insurance issuer must provide.

211.   Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover.  Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

212.   Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.

213.   Defendants, instead, delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

214.   The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend.  The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.

215.   Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act.

216.   Defendants have never explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

217.   Defendants also failed to engage in notice-and-comment rulemaking when issuing the interim final rules and the final rule incorporating the guidelines.

218.   Defendants' stated reasons for promulgating these rules without engaging in formal notice-and-comment rulemaking do not constitute "good cause."  Providing public notice and an opportunity for comment was not impracticable, unnecessary, or contrary to the public interest for the reasons claimed by Defendants.

219.   By enacting the "preventive care" guidelines and interim and final rules through delegation to a non-governmental entity and without engaging in notice-and-comment rulemaking, Defendants failed to observe a procedure required by law and thus violated 5 U.S.C. § 706(2)(D).

220.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

221.   Plaintiffs have no adequate remedy at law.

222.   The enactment of the U.S. Government Mandate without observance of a procedure required by law and its impending enforcement impose an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT VIII**
**Arbitrary and Capricious Action in Violation of the APA**

223.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

224.   The APA condemns agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

225.   The APA requires that an agency examine the relevant data and articulate an explanation for its action that includes a rational connection between the facts found and the policy choice made.

226.   Agency action is arbitrary and capricious under the APA if the agency has failed to consider an important aspect of the problem before it.

227.   A court reviewing agency action may not supply a reasoned basis that the agency itself has failed to offer.

228.   Defendants failed to consider the suggestion of many commenters that abortion-inducing drugs, sterilization, or contraception could not be viewed as "preventive care."

229.   Defendants failed adequately to engage with voluminous comments suggesting that the scope of the religious exemption to the U.S. Government Mandate should be broadened.

230.   Defendants did not articulate a reasoned basis for their action by drawing a connection between facts found and the policy decisions they made.

231.   Defendants failed to provide any standards or processes for how the Administration will decide which religious institutions will be included in the religious exemption.

232.   Defendants failed to consider the use of broader religious exemptions in many other federal laws and regulations.

233.   Defendants' promulgation of the U.S. Government Mandate violates the APA.

234.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

235.   Plaintiffs have no adequate remedy at law.

236.   Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IX
## Acting Illegally in Violation of the APA

237.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

238.   The APA requires that all Government agency action, findings, and conclusions be "in accordance with law."

239.   The U.S. Government Mandate and its exemption are illegal and therefore in violation of the APA.

240.   The Weldon Amendment states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

241.   The Affordable Care Act states that "nothing in this title (or any amendment by this title) shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year." 42 U.S.C. § 18023(b)(1)(A)(i).  It adds that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion.]"  *Id.* § 18023(b)(1)(A)(ii).

242.   The Affordable Care Act contains no clear expression of an affirmative intention of Congress that employers with religiously motivated objections to the provision of health plans that include coverage for abortion-inducing drugs, sterilization, contraception, or related education and counseling should be required to provide such plans.

243.   The U.S. Government Mandate requires employer-based health plans to provide coverage for abortion-inducing drugs, contraception, sterilization, and related education.  It does not permit employers or issuers to determine whether the plan covers abortion, as the Act requires.  By issuing the U.S. Government Mandate, Defendants have exceeded their authority, and ignored the direction of Congress.

244.    The U.S. Government Mandate violates RFRA

245.    The U.S. Government Mandate violates the First Amendment.

246.    The U.S. Government Mandate is not in accordance with law and thus violates 5

U.S.C. § 706(2)(A).

247.    Plaintiffs have no adequate or available administrative remedy, or, in the

alternative, any effort to obtain an administrative remedy would be futile.

248.    Plaintiffs have no adequate remedy at law.

249.    Defendants failure to act in accordance with law imposes an immediate and

ongoing harm on Plaintiffs that warrants relief.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby make demand for a trial by jury of all issues so triable.


**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.      Enter a declaratory judgment that the U.S. Government Mandate violates
        Plaintiffs' rights under RFRA;

2.      Enter a declaratory judgment that the U.S. Government Mandate violates
        Plaintiffs' rights under the First Amendment;

3.      Enter a declaratory judgment that the U.S. Government Mandate was
        promulgated in violation of the APA;

4.      Enter an injunction prohibiting the Defendants from enforcing the U.S.
        Government Mandate against Plaintiffs;

5.      Enter an order vacating the U.S. Government Mandate;

6.      Award Plaintiffs attorneys' and expert fees under 42 U.S.C. § 1988; and

7.      Award all other relief as the Court may deem just and proper.

Respectfully submitted, this the 21st day of May, 2012.


JONES DAY


/s/ *Jonathan M. Linas*
Daniel E. Reidy (*pro hac vice* pending)
dereidy@jonesday.com
Carol A. Hogan (*pro hac vice* pending)
chogan@jonesday.com
Mark P. Rotatori (*pro hac vice* pending)
mprotatori@jonesday.com
Brian J. Murray (*pro hac vice* pending)
bjmurray@jonesday.com
Dennis Murashko (*pro hac vice* pending)
dmurashko@jonesday.com
Jonathan M. Linas (*pro hac vice* pending)
jlinas@jonesday.com
77 West Wacker Drive
Chicago, IL 60601
(312) 782-3939 (telephone)
(312) 782-8585 (facsimile)

*Counsel for Plaintiffs*