IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**ARCHDIOCESE OF ST. LOUIS and**
**CATHOLIC CHARITIES OF ST. LOUIS,**

*Plaintiffs,*

v.                                                             CASE NO. 4:12-CV-924-JAR

**KATHLEEN SEBELIUS, et al.,**

*Defendants.*
_____/

**AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFFS FILED BY**
**THE AMERICAN CENTER FOR LAW & JUSTICE AND**
**SEVENTY-NINE (79) MEMBERS OF THE UNITED STATES CONGRESS**

Jay Alan Sekulow**
Jordan Sekulow**
Stuart J. Roth**
American Center for Law & Justice
201 Maryland Avenue, NE
Washington, DC 20002
202-546-8890; Fax. 202-546-9309

CeCe Heil**
American Center for Law & Justice
1000 Regent University Drive
Virginia Beach, Virginia 23464
757-226-2489; Fax. 757-226-2836

Geoffrey R. Surtees*
Kentucky Bar No. 89063
   *Counsel of Record*
Francis J. Manion**
American Center for Law & Justice
6375 New Hope Road
New Hope, Kentucky 40052
502-549-7020; Fax. 502-549-5252
Email: gsurtees@aclj.org

Edward L. White III**
American Center for Law & Justice
5068 Plymouth Road
Ann Arbor, Michigan 48105
734-662-2984; Fax. 734-302-1758

* Pro hac vice application pending
** Not admitted to E.D. Missouri Bar

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF THE AMICI CURIAE .....................................................................................1

INTRODUCTION .....................................................................................................................3

ARGUMENT .............................................................................................................................6

     PLAINTIFFS HAVE STANDING AND THEIR CLAIMS ARE RIPE ..............................6

CONCLUSION.........................................................................................................................12

CERTIFICATE OF SERVICE .................................................................................................13

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                                           Page(s)

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) ............................................................................................... 7, 10, 12

*American Petroleum Inst. v. EPA*,
   906 F.2d 729 (D.C. Cir. 1990) ............................................................................................. 8

*Blanchette v. Connecticut Gen. Ins. Corp.*,
   419 U.S. 102 (1974) ........................................................................................................... 7, 9

*FEC v. Wisconsin Right to Life, Inc.*,
   551 U.S. 449 (2007) ................................................................................................................ 1

*Florida State Conf. of NAACP v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ............................................................................................. 7

*Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*,
   764 F. Supp. 2d 684 (M.D. Pa. 2011) ................................................................................... 9

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
   508 U.S. 384 (1993) ................................................................................................................ 1

*Larson v. Valente*,
   456 U.S. 228 (1982) ................................................................................................................ 8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................................ 6

*Mead v. Holder*,
   766 F. Supp. 2d 16 (D.D.C. 2011),
   *aff'd by Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011) ................................................ 9-10

*McConnell v. FEC*,
   540 U.S. 93 (2003) ............................................................................................................... 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012) ........................................................................................................... 1

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ................................................................................................................ 1

*Riva v. Massachusetts*,
   61 F.3d 1003 (1st Cir. 1995) ............................................................................................ 10-11

*Seven-Sky v. Holder*,
   661 F.3d 1 (D.C. Cir. 2011), *superseded in part by*
   *Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012)..................................................................................................1

*TMLC v. Obama*,
   651 F.3d 529 (6th Cir. 2011), *superseded in part by*
   *Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   132 S. Ct. 2566 (2012)................................................................................................10

*Van Orden v. Perry*,
   545 U.S. 677 (2005).....................................................................................................1

*Zorach v. Clauson*,
   343 U.S. 306 (1952).....................................................................................................3


**STATUTES AND REGULATIONS**

45 C.F.R. § 147.130(a)(iv)(A)-(B)...........................................................................................8

77 Fed. Reg. 8725 (Feb. 15, 2012) ...........................................................................................8


**OTHER AUTHORITIES**

*Catechism of the Catholic Church* (2d ed. 1997) ....................................................................5

John Tracy Ellis, *Documents of American Catholic History* (1962) ................................ 3-4

Letter from Sister Marie Theresa Farjon de St. Xavier to Thomas Jefferson,
   http://www.churchstatelaw.com/historicalmaterials/images/Sr._Marie_Therese
   _letter_1804.pdf...........................................................................................................3

Letter from Thomas Jefferson to Sister Marie Theresa Farjon de
   St. Xavier, http://www.churchstatelaw.com/historicalmaterials/images/
   thomas_jefferson_letter_1804.pdf ...............................................................................4

Matthew L. Harris & Thomas S. Kidd eds., *The Founding Fathers & the Debate
   Over Religion in Revolutionary America:  A History in Documents*
   (Oxford U. Press 2012).................................................................................................4

Michael McConnell, *The Origins and Historical Understanding of Free Exercise
   of Religion*, 103 Harvard L. Rev. 1409 (1990) ...........................................................5

RJ&L Religious Liberty Archive,
   http://www.churchstatelaw.com/historicalmaterials/ 8_8_12.asp ................................................3

Susan J. Stabile, *State Attempts to Define Religion:  The Ramifications of Applying
   Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers,*
   28 Harvard J. L. & Pub. Pol'y 741 (2005).....................................................................................5

## INTEREST OF THE AMICI CURIAE

Amicus curiae, the American Center for Law & Justice ("ACLJ"), is an organization dedicated to defending constitutional liberties secured by law. ACLJ attorneys have argued before the Supreme Court of the United States and other federal and state courts in numerous cases involving constitutional issues. *E.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). ACLJ attorneys also have participated as amicus curiae in numerous cases involving constitutional issues before the Supreme Court and lower federal courts. *E.g.*, *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007); *Van Orden v. Perry*, 545 U.S. 677 (2005).

The ACLJ has been active in litigation concerning the Affordable Care Act ("ACA"), the statute on which Defendants rely as authority to promulgate the regulatory mandate, at issue here, to require employers to cover sterilization, prescription contraceptives, abortion-inducing drugs, and related patient education and counseling services in their health insurance plans ("Mandate"). The ACLJ filed several amicus curiae briefs in support of various challenges to the ACA, for example, *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012), and represented the plaintiffs in their challenge to the ACA in *Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011), *superseded on other grounds by* 132 S. Ct. 2566 (2012).

Moreover, the ACLJ has been active in the litigation concerning the Mandate. In particular, the ACLJ represents the plaintiffs in *O'Brien v. U.S. Department of Health & Human Services,* Case No. 4:12-cv-476 (E.D. Mo.), which is an action brought by a for-profit business to challenge the Mandate.

As such, the ACLJ has expertise in the issues raised here and has an interest that may be affected by the outcome of this action because any decision by this court will be persuasive authority in *O'Brien*.

Furthermore, this brief is filed on behalf of amici curiae, United States Representatives Jeff Landry (LA), Robert Aderholt (AL), Todd Akin (MO), Mark Amodei (NV), Michele Bachmann (MN), Spencer Bachus (AL), Lou Barletta (PA), Roscoe Bartlett (MD), Dan Benishek (MI), Gus Bilirakis (FL), Diane Black (TN), Marsha Blackburn (TN), Charles Boustany (LA), Kevin Brady (TX), Paul Broun (GA), Dan Burton (IN), Francisco "Quico" Canseco (TX), Bill Cassidy (LA), Steve Chabot (OH), Michael Conaway (TX), Chip Cravaack (MN), Jeff Duncan (SC), Renee Ellmers (NC), Stephen Fincher (TN), John Fleming (LA), Bill Flores (TX), J. Randy Forbes (VA), Jeff Fortenberry (NE), Virginia Foxx (NC), Bob Goodlatte (VA), Gregg Harper (MS), Andy Harris (MD), Vicky Hartzler (MO), Wally Herger (CA), Tim Huelskamp (KS), Bill Huizenga (MI), Bill Johnson (OH), Walter Jones (NC), Jim Jordan (OH), Mike Kelly (PA), Steve King (IA), John Kline (MN), Raul Labrador (ID), Doug Lamborn (CO), James Lankford (OK), Bob Latta (OH), Dan Lipinski (IL), Blaine Luetkemeyer (MO), Dan Lungren (CA), Don Manzullo (IL), Jeff Miller (FL), Mick Mulvaney (SC), Tim Murphy (PA), Randy Neugebauer (TX), Alan Nunnelee (MS), Pete Olson (TX), Steven Palazzo (MS), Ron Paul (TX), Steve Pearce (NM), Joe Pitts (PA), Ted Poe (TX), Mike Pompeo (KS), Ben Quayle (AZ), Reid Ribble (WI), Phil Roe (TN), Todd Rokita (IN), Ileana Ros-Lehtinen (FL), Dennis Ross (FL), Steve Scalise (LA), Bobby Schilling (IL), Jean Schmidt (OH), David Schweikert (AZ), Adrian Smith (NE), Chris Smith (NJ), Lamar Smith (TX), Glenn Thompson (PA), Tim Walberg (MI), Lynn Westmoreland (GA), and Joe Wilson (SC), who are seventy-nine (79) members of the United States House of Representatives in the One Hundred Twelfth Congress.

These Representatives have an interest both in expressing their view that the Mandate is unconstitutional and in representing their constituents, some residing within this judicial circuit, who are negatively impacted by the Mandate.

All of the amici curiae are dedicated to the founding principles of religious freedom in this country. They believe that the laws of this nation do not empower Defendants to force people of faith to violate their religious principles. The amici curiae bring a perspective to this case that should assist this court in resolving the issues before it.

## INTRODUCTION

The Mandate runs counter to longstanding American tradition. This Nation has a long and proud tradition of accommodating the religious beliefs and practices of all its citizens, not dividing them into "approved" and "disapproved" camps at the discretion of government functionaries. *See Zorach v. Clauson*, 343 U.S. 306, 313-14 (1952) (noting that government follows "the best of our traditions" when it "respects the religious nature of our people and accommodates the public service to their spiritual needs").

The Founding Fathers made it clear that both conscience rights and religious rights occupy the highest rung of civil liberty protections. For example, soon after the Louisiana Territory was acquired by the United States in 1803, the French Ursuline Sisters of New Orleans wrote to President Thomas Jefferson seeking assurances that "[t]he spirit of justice which characterizes the United States of America" would allow them to continue their spiritual and corporal works of mercy.[1] Thomas Jefferson replied that "[t]he principles of the Constitution

---

[1] RJ&L Religious Liberty Archive, http://www.churchstatelaw.com/historicalmaterials/8_8_12.asp (visited on Aug. 8, 2012); Letter from Sister Marie Theresa Farjon de St. Xavier to Thomas Jefferson, http://www.churchstatelaw.com/historicalmaterials/images/Sr._Marie_Therese_letter_1804.pdf (visited on Aug. 8, 2012); John Tracy Ellis, *Documents of American Catholic History* 184-85 (1962).

and government of the United States are a sure guarantee [that your religious institution] will be preserved to you sacred and inviolate, and that your institution will be permitted to govern itself according to it's [sic] own voluntary rules, without interference from the civil authority. . . ." Jefferson concluded his letter by assuring the sisters that their religious institution would receive "all the protection which my office can give it."[2]/

Moreover, President George Washington stated in a 1789 letter to the United Baptists in Virginia his views regarding the protections afforded religious liberties by the Constitution and that he would fight against any efforts by the government to threaten those religious liberties:

> If I could have entertained the slightest apprehension that the Constitution framed in the Convention, where I had the honor to preside, might possibly endanger the religious rights of any ecclesiastical Society, certainly I would never have placed my signature to it; and if I could now conceive that the general Government might ever be so administered as to render the liberty of conscience insecure, I beg you will be persuaded that no one would be more zealous than myself to establish effectual barriers against the horrors of spiritual tyranny, and every species of religious persecution.[3]/

Before these statements by Jefferson and Washington—in fact, even before the Declaration of Independence in 1776—the Continental Congress passed a resolution in 1775 exempting individuals with pacifist religious convictions from military conscription:

> As there are some people, who, from religious principles, cannot bear arms in any case, this Congress intend no violence to their consciences, but earnestly recommend it to them, to contribute liberally in this time of universal calamity, to the relief of their distressed brethren in the several colonies, and to do all other

---

[2]/ John Tracy Ellis, *Documents of American Catholic History* 185 (1962); Letter from Thomas Jefferson to Sister Marie Theresa Farjon de St. Xavier, http://www.churchstatelaw.com/historicalmaterials/images/thomas_jefferson_letter_1804.pdf (visited on Aug. 8, 2012).

[3]/ Matthew L. Harris & Thomas S. Kidd (editors), *The Founding Fathers & the Debate Over Religion in Revolutionary America: A History in Documents* 137-38 (Oxford U. Press 2012).

4

services to their oppressed Country, which they can consistently with their religious principles.[4]/

Even when the country was in dire need of men to take up arms to fight for independence, our forefathers knew that conscience is inviolable and must be honored. They understood that to conscript men into military service against their conscience would have undermined the very cause of liberty to which they pledged their lives, property, and sacred honor.

The Mandate imposes a substantial burden on individuals and organizations, including the Catholic Plaintiffs here, who firmly oppose having to subsidize, provide, and/or facilitate sterilization, contraceptives, and abortion-inducing drugs, and related patient education and counseling services, based on sincere religious beliefs. The Catholic Church's longstanding moral opposition to sterilization, contraception, and abortion does not stem from a tangential, minor point of doctrine; it is a core principle of the Catholic Church that these activities run contrary to a fundamental religious belief.[5]/ Plaintiffs' position on these issues is not something that can be carved out from their religious belief system. As one writer has described it:

> [T]he Church's position on birth control is not a stand-alone item. From the Church's standpoint, its position on birth control is part and parcel of its commitment to the sanctity of life. . . . This need to defend the right to life from beginning to end manifests itself in a cohesive body of beliefs that starts with contraception and runs through abortion, the death penalty, and assisted suicide.[6]/

---

[4]/ Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harvard L. Rev. 1409, 1469 (1990).

[5]/ *E.g., Catechism of the Catholic Church*, Nos. 2270-75, 2370, 2399 (2nd ed. 1997).

[6]/ Susan J. Stabile, *State Attempts to Define Religion: The Ramifications of Applying Mandatory Prescription Contraceptive Coverage Statutes to Religious Employers*, 28 Harvard J. L. & Pub. Pol'y 741, 755 (2005).

For Defendants to mandate that Catholic employers provide insurance coverage for services that are contrary to their basic religious tenets demonstrates a contempt by Defendants for what it means to be Catholic. Faithfulness to the teachings of the Church permeates every aspect of Plaintiffs' activity. Thus, the Mandate presents all Catholic employers with a stark choice: obey Caesar, or obey Christ. The burden of such a choice is clearly "substantial" in the constitutional sense.

Plaintiffs ask to be permitted to continue their work without having to violate their sincerely held religious beliefs or their right to freedom of conscience; the Mandate currently is putting Plaintiffs in that position. Plaintiffs seek the same protection of conscience provided to other religious groups from the time of the Continental Congress.

## ARGUMENT

## PLAINTIFFS HAVE STANDING AND THEIR CLAIMS ARE RIPE

Defendants contend that Plaintiffs lack standing and that their claims are not ripe. Defendants are wrong since Plaintiffs are currently injured by the Mandate. This case should proceed to a resolution on the merits.

The Supreme Court has explained that Article III standing consists of three elements: (1) an "injury in fact" that is concrete and particularized and is actual or imminent, (2) a causal connection between the injury and the complained of conduct, and (3) an injury that is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way," *id.* at 560, n.1, while the element of "imminent" harm is "a somewhat elastic concept," *id.* at 564 n.2, that "requires only that the anticipated injury occur within some fixed period of time in the future, not that it happen in the colloquial sense of soon

6

or precisely within a certain number of days, weeks, or months." *Florida State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008).

In considering the related concept of ripeness, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Hardship to the parties is present when the law places a plaintiff in a "very real dilemma," "has a direct effect on the [plaintiff's] day-to-day business," or "requires an immediate and significant change in the plaintiffs' conduct of their affairs." *Id.* at 152-53. In *Blanchette v. Connecticut General Insurance Corp.*, 419 U.S. 102 (1974), the Supreme Court stated that, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Id.* at 143 (citations omitted).

Defendants' argument comes down to whether Plaintiffs are experiencing an actual or imminent injury that gives Plaintiffs standing and makes their claims ripe. Defendants mainly contend that Plaintiffs are not injured because the Mandate will not impact Plaintiffs until after the safe harbor period ends,[7]/ and because the Mandate may be modified in the future to offer Plaintiffs and other religious organizations an accommodation that is absent from the current version of the Mandate. Defendants' contentions, however, should be rejected because Plaintiffs are concretely injured by the Mandate now, regardless of the safe harbor period or the supposed accommodation.

The Mandate at issue is a *final rule*. The Mandate was first enacted in July 2010, and

---

[7]/ The safe harbor period ends on August 1, 2013, and the Mandate applies thereafter when the health plan year begins. Defendants state that the Mandate applies to Plaintiffs on July 1, 2014. (Doc. 17 at 11.)

was amended in August 2011, to add a narrow exemption for certain religious employers.[8]/ In February 2012, the Mandate was "*adopted as the final rule without change.*" 77 Fed. Reg. 8725, 8730 (Feb. 15, 2012) (emphasis added). Although Defendants contend that there may be changes to the final rule, including a possible accommodation, that contention is meaningless for the purposes of the pending motion to dismiss. "[A]n agency *always* retains the power to revise a final rule through additional rulemaking. If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely." *American Petroleum Inst. v. EPA*, 906 F.2d 729, 739-40 (D.C. Cir. 1990). In other words, while Defendants could eventually make a mootness argument in the event that a hypothetical statutory or regulatory change is made at some point in the future that exempts Plaintiffs and other individuals and organizations in a similar position from the Mandate, that hypothetical possibility does not negate the existence of the present justiciable controversy that arises from currently existing legal requirements.

The Mandate presents Plaintiffs with a dilemma: comply with the Mandate and violate the tenets of their religion or not comply with the Mandate and pay significant annual penalties. Plaintiffs have no reason to believe that their present opposition to the Mandate (an opposition

---

[8]/ To be eligible for the exemption, a religious employer must have as its purpose the inculcation of religious values, primarily employ and serve those who share the religious tenets of the organization, and be a nonprofit organization as described in sections 6033(a)(1), (3)(A)(i) or (ii) of the Internal Revenue Code. 45 C.F.R. § 147.130(a)(iv)(A)-(B). Religious employers (such as Plaintiffs) that serve the larger community without regard to religious belief, including various hospitals, charities, and schools, do not appear to fall within this description because they employ and serve people from all walks of life, including those of different religious faiths. Regardless, the exemption itself is unconstitutional because it requires government officials to determine whether a religious employer is "religious enough" to qualify, thus requiring government officials to engage in an unconstitutional intrusive inquiry into the employer's religious purpose, beliefs, and practices; those deemed "religious enough" are exempted from the mandate; those deemed not "religious enough" are not exempted. *See Larson v. Valente*, 456 U.S. 228 (1982) (explaining that the government may not discriminate among religious organizations in imposing burdens).

8

based on Plaintiffs' religious beliefs) will change so drastically that they will voluntarily comply with the Mandate when the safe harbor period ends; rather, Plaintiffs will be forced, among other options, to pay annual penalties.  Therefore, Plaintiffs necessarily will be compelled to adjust their financial affairs now to prepare to pay significant amounts to the government on an annual basis, and they will be unable to use that money for other purposes.  (*See, e.g.,* Doc. 1, Compl. at ¶¶ 57-60 (allegations regarding fines and penalties); ¶ 133 (alleging that "if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to annual government fines and penalties.  Plaintiffs require time to budget for any such additional expenses.")).

As in *Blanchette*, Plaintiffs' financial decisions "to be made now or in the short future" are directly affected by whether the merits of their claims are decided now.  *See* 419 U.S. at 144.  Plaintiffs, then, are currently injured by the Mandate and their injury can be redressed by a favorable decision from this court.

The situation here is similar to what occurred in the lawsuits filed in 2010 that challenged the Affordable Care Act's individual mandate, which requires virtually all American citizens to purchase government-approved health insurance from private companies starting on January 1, 2014.  The government initially raised standing and ripeness defenses because the individual mandate would not go into effect until *four years* after the filing of the lawsuits and a lot could happen in that time period.  Courts, however, rejected the government's arguments because the cases presented largely legal questions (as the instant action does), and plaintiffs were experiencing actual injury by having to prepare financially for the cost of health insurance if they complied with the individual mandate, or for the cost of the annual penalties (as Plaintiffs must) if they did not comply with the individual mandate.  *E.g.*, *Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 764 F. Supp. 2d 684, 690-94 (M.D. Pa. 2011) (citing additional cases);

*Mead v. Holder*, 766 F. Supp. 2d 16, 23-28 (D.D.C. 2011), *aff'd by Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011); *accord TMLC v. Obama*, 651 F.3d 529, 535-39 (6th Cir. 2011) (noting that the Supreme Court has permitted lawsuits to go forward where the complaints were filed roughly three to six years before the laws went into effect and that the D.C. Circuit has permitted a case to proceed where the law would not go into effect for thirteen years).[9]/

Moreover, the present case is analogous to the situation in *Riva v. Massachusetts*, 61 F.3d 1003 (1st Cir. 1995), in which the First Circuit held that plaintiff Robert Keenan's challenge to a state accidental disability retirement scheme was ripe. Keenan was notified that a law could reduce his monthly accidental disability benefits when he turned sixty-five years old. *Id.* at 1006. Keenan joined a suit challenging the law despite the *seven-year gap* until his benefits would be reduced; as the First Circuit phrased it, he "subscrib[ed] to the adage that an ounce of prevention is sometimes worth a pound of cure." *Id.*

In discussing *Abbott Labs*, the First Circuit noted that the hardship prong entailed an analysis of whether "'the challenged action creates a 'direct and immediate' dilemma for the parties'" and whether "'the sought-after declaration would be of practical assistance in setting the underlying controversy to rest.'" *Id.* at 1009-10 (citations omitted). The government argued that whether Keenan's benefits would actually be reduced was speculative because he could die before age sixty-five, he might no longer be disabled at that age, or the state law could be amended over the next seven years. *Id.* at 1011. The First Circuit held that, despite these potential contingencies, Keenan's injury was "highly probable," *id.*, and explained:

---

[9]/ *McConnell v. FEC*, 540 U.S. 93, 224-26 (2003), is distinguishable because there is a key difference between a challenge to a provision that might affect decisions that the plaintiff *will make five years later* (such as the decisions that Senator McConnell would make immediately before a future election) and a challenge to a provision that has a *direct impact on the plaintiff's decision-making now* (such as Plaintiffs' current financial planning in this case).

10

> In all events, *a litigant seeking shelter behind a ripeness defense must demonstrate more than a theoretical possibility that harm may be averted.* The demise of a party or the repeal of a statute will always be possible in any case of delayed enforcement, yet it is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable. The degree of contingency is an important barometer of ripeness in this respect.

*Id.* (emphasis added; citations omitted).

Additionally, the First Circuit stated that "the most immediate harm to Keenan comes in the form of *an inability prudently to arrange his fiscal affairs*." *Id.* at 1012 (emphasis added). Keenan could not prepare his fiscal affairs with certainty until the resolution of whether the law, which could reduce his monthly accidental disability benefit, was valid. The First Circuit explained, "[w]e believe that this uncertainty and the considerations of utility that we have mentioned coalesce to show that Keenan is suffering a sufficient present injury to satisfy the second prong of the *Abbott Labs* paradigm. *Id.*

As in the above-mentioned cases, this court should reject Defendants' arguments. Plaintiffs have been, and continue to be, injured by the Mandate because they must rearrange their fiscal affairs now to prepare to pay significant annual penalties, and their injury can be redressed by a favorable ruling from this court. A present injury of this nature is sufficient to establish that Plaintiffs have standing and that their claims are ripe.[10]/

---

[10]/ In seeking a dismissal, Defendants overemphasize the Advanced Notice of Proposed Rulemaking ("ANPRM") as a reason why Plaintiffs lack standing and ripe claims. Just because Defendants have issued the ANPRM does not mean they will amend the Mandate by August 1, 2013, to satisfy the constitutional and statutory concerns raised by Plaintiffs. Should this court dismiss this case, as Defendants seek, there is nothing to stop Defendants from waiting until right before August 1, 2013, the end of the safe harbor period, to announce they will not amend the Mandate to address Plaintiffs' constitutional and statutory concerns. If Plaintiffs' action were dismissed, as Defendants want, Plaintiffs would be subjected to the Mandate on July 1, 2014, (Doc. 17 at 11), and would have to restart this litigation. Under Defendants' approach, Plaintiffs would not have the benefit, as they would now if their case continues, of receiving a judicial determination of their rights either to know whether they will be subjected to the Mandate and

*(Text of footnote continues on following page.)*

## CONCLUSION

Amici curiae respectfully request that this court deny Defendants' motion to dismiss and allow this case to proceed to a resolution on the merits of Plaintiffs' claims.

Respectfully submitted on this 21st day of August 2012,

| | |
|---|---|
| | */s/ Geoffrey R. Surtees* |
| Jay Alan Sekulow** | Geoffrey R. Surtees* |
| Jordan Sekulow** | Kentucky Bar No. 89063 |
| Stuart J. Roth** | *Counsel of Record* |
| American Center for Law & Justice | Francis J. Manion** |
| 201 Maryland Avenue, NE | American Center for Law & Justice |
| Washington, DC 20002 | 6375 New Hope Road |
| 202-546-8890; Fax. 202-546-9309 | New Hope, Kentucky 40052 |
| | 502-549-7020; Fax. 502-549-5252 |
| CeCe Heil** | Email: gsurtees@aclj.org |
| American Center for Law & Justice | |
| 1000 Regent University Drive | |
| Virginia Beach, Virginia 23464 | Edward L. White III** |
| 757-226-2489; Fax. 757-226-2836 | American Center for Law & Justice |
| | 5068 Plymouth Road |
| * Pro hac vice application pending | Ann Arbor, Michigan 48105 |
| ** Not admitted to E.D. Missouri Bar | 734-662-2984; Fax. 734-302-1758 |

---

have to continue to prepare for penalties during the safe harbor period, or to know whether they will not be subjected to the Mandate and be able to use their money for other purposes. Rather, under Defendants' approach, Plaintiffs would be in a state of limbo until about August 1, 2013, not knowing how to conduct their affairs with certainty. The hardship on Plaintiffs under Defendants' approach would be severe and is more reason not to dismiss Plaintiffs' case. *See Abbott Labs.*, 387 U.S. at 152-53 (explaining that hardship is present when the law places a plaintiff in a "very real dilemma," "has a direct effect on the [plaintiff's] day-to-day business," or "requires an immediate and significant change in the plaintiffs' conduct of their affairs.").

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2012, I electronically filed the foregoing with the Clerk of the Court using the court's CM/ECF system which sent notification of such filing to the following counsel of record for Plaintiffs, who are registered users of the CM/ECF system:

Daniel Reidy
Carol Hogan
Mark Rotatori
Brian Murray
Dennis Murashko
Jonathan Linas
Jones Day
77 West Wacker Drive
Chicago, Illinois 60601

and to the following counsel of record for Defendants, who is a registered user of the CM/ECF system:

Jacek Pruski
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C. 20530

*/s/ Geoffrey R. Surtees*
Geoffrey R. Surtees*
Kentucky Bar No. 89063
  *Counsel of Record*
American Center for Law & Justice
6375 New Hope Road
New Hope, Kentucky 40052
502-549-7020; Fax. 502-549-5252
grsurtees@gmail.com
* Pro hac vice application pending